ANNA KIMBALL, The, (KIMBALL v.)

[See Kimball v. The Anna Kimball, Case No. 7,772.]

## Case No. 405.

### ANNAN v. The STAR OF HOPE.

[Hoff. Op. 460; 9 Wall. (76 U. S.) 203.]

District Court, D. California. 1859.[1]

SHIPPING—GENERAL AVERAGE—EXPENSES—VALUATION OF SHIPPING—REPAIRS.

[1. Where consignees, in discharge of their duty as such, cause a general average to be adjusted and stated by an experienced despacheure, their expenses in so doing should be contributed for in general average, when the adjustment is affirmed by the court against objection.]

[See note at end of case.]

[2. When a ship arrived in port, it was found that damages had been sustained by the vessel and cargo, which were to be made good in general average, and it became necessary to collect from the shippers the estimated amounts for exact security therefor before delivering the goods, which was accordingly done by the consignees. *Held*, that their commissions at the customary rate of the port for such collections and payments should be contributed for in general average.]

[See note at end of case.]

[3. The value of a vessel at the port of delivery is not a proper measure of her contributory value for the purposes of general average; and, in the absence of evidence, the amount of insurance may be taken as her value.]

[See note at end of case.]

[4. Where the incapacity of a ship renders it necessary to seek a port of distress, repairs of a permanent character which would have been incurred irrespective of benefit to the cargo, and expenses incidental to such repairs, should not be contributed for in general average.]

[See note at end of case.]

[5. Where cargo is sold to raise funds to pay for repairs, the loss of such sale should be contributed for in general and particular average, in proportion to the amounts expended for repairs chargeable in general and particular average respectively.]

[See note at end of case.]

[6. The expense of heaving down preparatory to repairing a vessel, and of staging during the repairs, should not be brought into general average unless the repairs are so chargeable.]

[See note at end of case.]

[Libel by W. C. Annan and others against the ship Star of Hope to recover the value of goods which the ship had failed to deliver. A contribution in general average was ordered, and the case is now heard on exceptions to various charges in the commissioner's report. Overruled. This was affirmed by the circuit court without opinion. Reversed by supreme court in The Star of Hope v. Annan, 9 Wall. (76 U. S.) 203. See note at end of case.]

["The ship Star of Hope sailed Feb. 10, 1856, from New York for San Francisco with a full cargo of divers kinds of merchandize

[1][Affirmed by circuit court without opinion. Reversed by supreme court in The Star of Hope, 9 Wall. (76 U. S.) 203.]

including 500 casks and packages of spirituous liquors and 40 or 50 kegs of gunpowder prepared as 'patent safety fuses.' There were also 244 1-2 tons of coal shipped by the owners and stowed next to the liquors. On the 14th of April following it was discovered that great quantities of smoke and vapor were issuing from the fore and after hatches of the ship. She was proceeding on her voyage, at the time the discovery was made, in latitude forty-six degrees south, longitude fifty-three degrees west, but the weather was squally and the sea was rough. Precautions, such as are usual on such occasions, were immediately adopted: the hatches were fastened down, and 'everything made tight,' in order to check as much as possible the progress of the fire, at least until a port of succor could be reached. Great alarm was felt, and the fears of all were much increased by the fact, well known to all, that the cargo contained prepared gunpowder, and large quantities of spirituous liquors. Under the circumstances the crew refused to continue the voyage, and the master determined very properly, as the parties agree, to make for the bay of San Antonio, on the southeast coast of Patagonia, as the nearest anchorage, and at the end of four days the ship arrived off that bay, and set the usual signal for a pilot. Throughout that period the signs of fire continued to increase, and in getting up the chains, so as to be ready to cast anchor without delay, they were found to be quite hot, and there were other indications of fire, which greatly heightened the general alarm. Unwilling to run into a bay, unknown to him, without a pilot, the master set his signal as aforesaid, and waited three hours for one, but no one came, and it became evident that none could be expected, as the coast was wild and desolate. Something must be done, as the alarm increased as the impending peril became more imminent. Haul off, the master could not, as the wind and waves were against any such movement. He could not resume the voyage for the same reason, and also because the crew utterly refused their co-operation; nor could he with safety any longer attempt to 'lie to,' as the ship was gradually approaching the shore, and because she was exposed both to the impending peril of fire on board, and to the danger, scarcely less imminent, of shipwreck from the wind and waves. Nothing, therefore, remained for the master to do, which it was within his power to accomplish, but to run the vessel ashore, which it is agreed by the parties would have resulted in the 'certain and almost instant loss of vessel, cargo and all on board,' or to make the attempt to run into the bay without the assistance of a pilot. Evidently he would have been faithless to every interest committed to his charge if he had attempted to beach the vessel at that time and place, as the agreed statement shows that the weather was rough, that the wind was high and blowing towards the land

with a heavy sea, and that the shore was rocky and precipitous. What the master did on the occasion is well described by the parties in the agreed statement in which they say he at length determined, as the best thing to be done for the general safety, and especially for the preservation of the cargo and the lives of those on board, to make the attempt to run in without a pilot, preferring all risks to be thereby incurred rather than to remain outside in the momentary apprehension of destruction to all, and the parties agree that he was fully justified in his decision as tested by all the circumstances, although the ship in attempting to enter the bay grounded on a reef, and before she could be got to sea again sprung a leak and sustained very serious injuries in her bottom. Great success, however, attended the movement, notwithstanding those injuries, as the water taken in by the ship extinguished the fire, and the ship remained fast and secure from shipwreck until the winds subsided and the sea became calm. Repairs could not be made at that place, and the parties agree that the injuries to the ship were such as fully justified the master in returning to Montevideo for that purpose, as that was the nearest port where the repairs could be made. He arrived there on the twenty-seventh of the same month, and it appears by the agreed statement that the just and necessary expenses incurred by the ship at that port to enable her to resume the voyage were $100,000, including repairs, unloading, warehousing and reloading of the cargo, and that the master, being without funds or credit, was obliged to sell a considerable portion of the cargo to defray those expenses. Repaired and rendered seaworthy by those means the ship, on the 11th of September, in the same year, resumed her voyage and arrived at her port of destination on the 7th of December following, and the master, without unnecessary delay, delivered the residue of the shipments in good order to the respective consignees, as required by the contract of affreightment."][2]

HOFFMAN, District Judge. In this case libels were filed by various shippers to recover the value of goods which the ship had failed to deliver. The liability of the ship was not contested, nor was it denied that the amount due the shippers for short delivery, or non delivery, were [was] to be diminished by the amounts due from them respectively for their shares of a general average contribution. The object, therefore, of the litigation was to obtain a decision of the court on the question, whether certain damage sustained by the ship by reason of a stranding, or the expense of repairing such damage, was to be made good by a general

average contribution, or was particular average on the ship. The cause was submitted on an agreed statement of facts, and under a stipulation that after the decision of the court, as to the principle question, the general average should be stated and adjusted by a commissioner, in accordance with such decision, and the amounts to be recovered by each libellant should be subject to the deduction of the sums so ascertained to be due from them respectively, as their proportional shares of the general average contribution. The commissioner having stated the general average in accordance with the principles declared in the opinion of the court heretofore delivered, exceptions are now filed to various charges, and adjustments contained in the statement reported by him.

The first exception is to the allowance of various items contained in schedule B. of the statement. These items are for expenses and disbursements incurred in stating the general average. It appears by the agreed statement of facts, that Annan & Embury, who had become the assignees and successors in interest of Annan, Talmage & Co., the charterers of the ship, claimed and obtained the control of the vessel and cargo on her arrival at this port. They collected the freight, received the goods deliverable to themselves, and delivered the goods belonging to other shippers—first obtaining from them the amount of their general average contribution or security therefor. They, also, in the discharge of their duty as consignees, caused a general average to be adjusted and stated by an experienced despacheure—in the course of which proceeding the expenses and charges mentioned in Schedule B. were incurred. As the shipowners or insurers were dissatisfied with the principles on which the adjustment was made, suit was brought in this court, in the form and under the circumstances above mentioned, to procure a judicial determination of the point in controversy. The decision of the court was in favor of the average as adjusted and stated by the despacheure, or rather, of the correctness of the principle on which the same has been made. The commissioner, therefore, to whom it was referred to state the average, was not required to enter into the details of the various charges, allowances, accounts, etc., necessary to be ascertained and liquidated before a statement of a general average can be made. But the statement already made was, by consent, adopted by him, and reported to the court, subject to any exceptions which might be taken. In that statement are included the expenses of making the adjustment, the propriety of including which, is the question raised by the exception under consideration.

It is not denied that as a general rule, the expense of adjusting a general average forms a part of the losses to be made good.

[2][This statement of the facts of the case is taken from the opinion of Mr. Justice Clifford in The Star of Hope, 9 Wall. (76 U. S.) 203.]

by contribution. But it is said that this statement was abortive, and not the adjustment by which the rights of the parties are determined; that the statement made under the direction of this court is the only one that can have such an effect, and that, therefore, the expenses of attempting to make a previous statement must be rejected. But it is obvious that all those expenses were necessarily incurred for the general benefit. The expense for stationery, clerk hire, warehousing, opening, examining, and appraising cargo; for drayage of the same, insurance, notary's fees for preparing affidavits, and for the services of a professional adjuster in examining, stating and adjusting general average, were all indispensable to the ascertainment of the sums due from the various interests, in general average contribution. Had those expenses not been incurred, or those services not been performed, they would have been necessary under the order of this court, and before any decree in the cause could have been made. Instead of referring the cause to one of the ordinary commissioners of the court to report a statement of the general average, a reference to a competent professional adjuster would have been necessary, and the expenses above alluded to would have been incurred. All the interests have thus been directly benefited by these expenses, incurred for the common advantage and the determination of the only point on which a difference of opinion existed, has been made easy and expeditious. The decision of the court has moreover determined in effect that the statement so made was correct in the only point on which its correctness was disputed—which furnishes an additional reason why the expenses incident to making the statement should be carried, as is usual, to general average account. I am inclined to think that even if this were not so, and the court had declared the principles on which the adjustment had been made to be erroneous, the expenses of such attempted adjustment ought to be allowed in general average. It is of the utmost importance to commerce that settlements of this kind should be made without resort to suits at law. In practice, average statements are made by a class of persons who, in every commercial city, make that business a profession, and whom it is the universal custom to employ where an average contribution is to be stated and adjusted. The expense of examining and appraising goods, auditing and liquidating claims, etc., is necessarily considerable, and must be incurred before the data or elements of the calculation can be obtained. When, therefore, the master or agent of the ship, in good faith, and according to custom, engages the services of a competent and reputable adjuster, and incurs the expense preliminary or incidental to an adjustment, it seems equitable that such expenses should be paid for in general average, notwithstanding that the principles of the adjust may afterwards be found to be erroneous by a court. If such expenses be not allowed, the practical result might be that in all cases of general average suits at law would result, for the master would not incur the expense necessary to an adjustment by a despacheure, if such expenses would have to be borne by himself whenever any of the parties refused to assent to the correctness of the adjustment. He would naturally prefer that a suit should be at once brought, and the average adjusted by the court, in which case the expense would be contributed for, rather than incur the risk of being himself obliged to defray the whole expense of an attempted adjustment by despacheure. For these reasons I incline to think that such expenses should, in all cases, be placed to general average account. But, under the circumstances of the case, there can, I think, be no doubt that the expenses and charges referred to should be contributed for in general average.

It is objected, however, that the allowance of commissions, for collecting and paying general average is at all events inadmissible. This charge is made by the consignees of the ship under whose direction the general average was adjusted. Its amount appears to be the ordinary charge established by usage and sanctioned by a rule of the chamber of commerce of this city. If the services have been, or are to be rendered, and if the expense properly forms a part of and is incidental to the adjustment, settlement and final liquidation of a general average contribution, it ought, on principle, to be allowed, for it is an expense incidental to, or necessarily consequent upon the loss or damage which gave rise to the general average. When the ship arrived and it was found that damages had been sustained by the vessel and the shippers, which were to be made good in general average, it became necessary to collect from the shippers either the estimated amounts due from them respectively, or to exact security therefor before their goods were delivered to them. This was done by the consignees of the ship, as appears by the agreed statement of facts. It cannot be said that the amounts found to be due from each shipper are now to be collected under the decree of this court, by deducting them from the amount otherwise recoverable for short delivery, for it does not appear that all the shippers have libelled for non-delivery; and it is plain that as only a portion of the cargo was sold to obtain funds, the owners of the remaining portion have received their goods and have no claim upon the vessel. They are liable, however, to the vessel and the other interests to make good their proportionate share of the losses incurred for the common safety. These

amounts must, therefore, be collected, and the customary commission for such a service ought to be allowed. In the stipulation on file, it is agreed that "from the amounts, if any decreed to be due to Annan & Embury (who were charterers and freighters as well as consignees of the ship) should be deducted not only the amounts due from them for freight under the charter party, but also the amount of the moneys paid or secured to be paid to them by the several consignees of the cargo as their proportion of the general average upon their respective portions of the said cargo, and the decree to be entered in their favor shall be only for the sum remaining after such deduction." They are thus treated in this stipulation not only as having collected or being bound to collect the general average contributions, but it would seem as insurers of those portions of the contributions for which they have taken security, for there is to be deducted from the amount due them for short delivery—not only the amount of contributions paid in by the various consignees of cargo, but also the amounts secured to be paid, but which are not yet collected. It seems to me that under these circumstances the customary mercantile commission for collecting the general average ought to be allowed, notwithstanding that in part such collections are to be made from themselves.

The second exception refers to the amount at which the contributory value of the ship is stated in the adjustment, or rather to the basis of the valuation. The valuation adopted is that at which she was insured. It is contended that her value at this port (admitted to be $40,000) forms the proper basis for estimating her contributory value. The principle on which the contributory value of the vessel, in general average, is estimated, is to ascertain her true value to her owner. But this value is neither increased nor diminished by an accidentally small or great demand for shipping at the port of delivery, as the vessel is ordinarily not intended to be sold, but to return to her home port. It is clear that the amount which is saved to her owner ought not to be estimated by the amount for which she could be sold in a foreign port where there may be no demand for, or no means of purchasing similar vessels. As the amount expended for repairs, in the course of the voyage, must be deducted from the contributory value, it is evident that if the value in a remote foreign port be taken as a basis for the calculation, that value may often not be equal to the expense of repairs, and thus the ship would contribute nothing. The rule usually adopted is to estimate the value of the ship at the commencement of the voyage, deducting therefrom a certain allowance for wear and tear, deterioration, etc. In New York and Pennsylvania the amount deducted is one-fifth; but such a deduction

is necessarily arbitrary and unequal in its operation, and it seems is not adopted in New York, where the true value can be ascertained. It is stated by a recent writer, on the law of shipping, (Dixon, p. 501,) to be frequently "the best guide for determining the contributory interest of the ship, to make the valuation in its policy of insurance the basis of the calculation; but in such cases it is to be considered whether the ship was insured at her full value, including outfit, provisions, advanced wages and premium, net freights, etc., without profit, and after deducting the probable wear and tear, and the gross freights. In the first case the outfit, wear, tear, and premium are to be deducted." It does not appear on what basis the valuation in the policy was fixed. But the exception taken is founded on the idea that her value at this port is to be taken as the basis of the calculation; a mode of estimating her value which seems to me to be erroneous. I shall, therefore, overrule the exception, with liberty, however, to the claimant to except to the valuation as fixed —on the ground either that her true value at the commencement of the voyage, with the proper deductions for wear and tear, has not been ascertained; or on the ground that the proper deductions have not been made from the valuation in the policy, if that be taken as the basis of the calculation, provided always that that valuation include outfit, advanced wages and premium, etc., as mentioned in the work above quoted.

The third exception relates to certain repairs—the expenses of which are charged to the ship as particular average, and some of which are subjected to the customary deduction of one-third new for old. With respect to the repairs charged to the ship as particular average, it is contended that the rule is: "that only the repairs over and above those required to remove the incapacity of the ship to proceed on her voyage will be considered as having enured to her benefit and to be chargeable to her alone, but that all other repairs are to be made good in general average." But a moment's consideration will show us that this is not an accurate statement of the rule. It has already been decided that the damage by stranding, or the expense of repairing such damage, did not in this case form the subject of a general average contribution—but was to be borne by the ship as particular average. It was admitted that it was necessary to seek a port of distress—by reason of the incapacity of the ship to pursue her voyage. If then, the principle contended be applied to this case, it must be applied to all others where the ship necessarily seeks a port of refuge for repairs. In all such cases the ship is incapable of continuing her voyage, otherwise the deviation is unjustifiable, and the repairs made are always necessary to remove her incapacity to proceed. But such repairs are always re-

puted particular average. "If masts or rudder be carried away in a storm, or by lightning, it will be for the benefit of all parties concerned that they be replaced, but it was never yet contended that the owner of goods was to bear any part of the expense." Per Mr. J. Livingston; Walden v. Le Roy, 2 Caines, 262. It is obvious that if all repairs necessary to enable the ship to proceed are for that reason to be brought into general average, it will be difficult to imagine a case where repairs made in a port of distress will not be contributed, for the fact that the vessel is obliged to seek such a port and to make such repairs, will demonstrate that they were necessary to the further prosecution of the voyage. The true rule is stated by Mr. J. Bayley, in Plummer v. Wildman, 3 Maule & S. 482, the case chiefly relied on by the counsel for the claimant: "If the repairs were merely such as were necessary to enable the ship to prosecute her voyage home, and were afterwards of no benefit to her, such repairs would properly come under the ' head of general average.'" The observations of Lord Ellenborough which precede those of Mr. J. Bayley, plainly referred to the particular circumstances of the case before him. It appears by the report, that the repairs which it was claimed should be paid for in general average were temporary and for the mere purpose of completing the voyage, and that when the vessel reached home, she was repaired more effectually. The true rule on the subject is thus laid down with his usual perspicuity, by Mr. Ch. Kent: "The cost of the repairs so far as they accrue to the ship alone as a benefit and would have been necessary in that port, on account of the ship alone, are not average. But if the expense of the repairs would not have been incurred but for the benefit of the cargo, and might have been deferred with safety to the ship to a less costly port, such extra expenses are general average." 3 Kent, Comm. 303. The test proposed by Mr. Phillips (2 Ins. § 1300) is: "How much of the repairs are temporary, and how much are permanent." In this case the repairs to the ship rendered necessary by the stranding were obviously of a permanent character. They consisted chiefly of caulking, coppering, painting, etc. But to effect these repairs certain incidental expenses were such as surveys, etc., wear and tear of materials, cordage, blocks, boat hire, etc. These expenses being incidental to and part of the cost of the repairs which are charged to the ship, should, it seems to me, on obvious principles, be charged to the same account. The repairs themselves being particular, and not general average, all the expenses of making them should also be reputed particular average. With respect to the expense of raising funds (i. e., loss on sale of cargo), it is obvious that it being ascertained which repairs of the expenses are general average, and which are particular average chargeable to

the ship, the expense of raising funds to meet those expenses should be charged to particular average and to general average, in the proportion which those accounts bear to each other, or in other words, general average should be deemed to have obtained funds to pay general average expenses, and particular average funds to defray particular average expenses—and the premium or cost of obtaining them should be borne by each, according to the amounts deemed to have been raised for the benefit of each. This, I understand to have been done. Peters v. Warren Ins. Co., [Case No. 11,034.]

With respect to the deduction of one-third new for old, it is to be observed that this deduction is an arbitrary and sometimes not a very equitable allowance made for the supposed advantage accruing to the owner from having old materials replaced by new. The exception in favor of ships on their first voyage, which obtains in England, has not been annulled in America. Phil. Ins. § 1431. The reason of the rule being that the owner is presumed to be benefitted to the extent of one-third by the repairs, it follows, that in estimating the contributory value of the ship, there must be deducted from her value at the commencement of the voyage the cost of the repairs. less one-third new for old. For to that extent the repairs are presumed to have added to the permanent value of the ship.

The question thus raises, what expenses belong to repairs? It seems to be the usage to include in the expense of repairs, from which one-third is to be deducted, not merely the cost of materials and labor, but also the incidental charges necessarily incurred in making the repairs. In the case of Potter v. Ocean Ins. Co., [Case No. 11,335,] Judge Story held that this deduction should not be made from the expense of towing the vessel across the Mississippi, etc., to be repaired, and the cost of assistance in getting her across and boat hire, etc. But there seems to be no such charges in this statement of this case. The boat hire charged being that for workmen, whilst the vessel was hove down. It is claimed that the expense of heaving down preparatory to the repairs, and of staging, etc., during the repairs. should be brought into general average. But if the expense of repairs, etc., be, as has been already decided, particular average, I cannot perceive how I can discriminate between the expense of the repairs themselves and the necessary expenses incidental to them. The expense of heaving a ship down, and of staging to the workmen, seems to be as much a part of the cost of repairing her bottom as that of the plank, or copper, or oakum used for the purpose. Had any of these expenses been incurred for the purpose of merely temporary repairs, of no permanent benefit to the ship, and which it would be necessary subsequently to replace, they should undoubtedly have been brought into general average. But all

the repairs seem to have been of a permanent character; and being such, all expenses of making them should be carried to account of particular average unless the disaster which rendered them necessary was such as to give rise to a general average contribution, a point already decided adversely to the claimant by this court.

A decree in conformity with this opinion must be entered.

[NOTE. The circuit court affirmed this decree on appeal, whereupon an appeal was taken to the supreme court, which reversed the decree. The Star of Hope v. Annan, 9 Wall. (76 U. S.) 203. Mr. Justice Clifford, in delivering the opinion, said:

["Where the ship is voluntarily run ashore to avoid capture, foundering, or shipwreck, and she is afterwards recovered, so as to be able to perform her voyage, the loss resulting from the stranding, says Mr. Arnould, is to be made good by general average contribution; and the writer adds that there is no rule more clearly established than this by the uniform course of maritime law and usage. 2 Arn. Ins. 784; Lewis v. Williams, 1 Hall. 474. Sustained, as that proposition is at the present day, by universal consent, it does not seem to be necessary to refer to other authorities in its support, nor is it necessary to enlarge that rule in order to dispose of the present controversy; but, to prevent any misconception as to the views of the court, it is deemed proper to add that it is settled law in this court that the case is one for general average, although the ship was totally lost, if the stranding was voluntary, and was designed for the common safety, and it appears that the act of stranding resulted in saving the cargo. Columbian Ins. Co. v. Ashby, 13 Pet. (38 U. S.) 331; Caze v. Reilly, Case No. 2,538; Sims v. Gurney, 4 Bin. 513; Gray v. Waln, 2 Serg. & R. 229; 1 Pars. Shipp. 372; Merithew v. Sampson, 4 Allen, 192. Undoubtedly the sacrifice must be voluntary, and must have been intended as a means of saving the remaining property of the adventure, and the lives of those on board; and, unless such was the purpose of the act, it gives no claim for contribution; but it is not necessary that there should have been any intention to destroy the thing or things cast away, as no such intention is ever supposed to exist. On the contrary, it is sufficient that the property was selected to suffer the common peril in place of the whole of the associated interests that the remainder might be saved. 1 Pars. Shipp. 348.

[Suggestion is made that the act of stranding of the vessel in this case was not a voluntary act, as the reef where she grounded was not visible at the time, and was unknown to the master, but the agreed statement shows that in undertaking to run into the bay the master knew that the chief risk he had to encounter was the stranding of the ship, and the precautions which he took to guard against that danger show to the entire satisfaction of the court that the disaster was not altogether unexpected. As the ship advanced, the lead was constantly employed, showing eight fathoms at the first, then seven, then six only, and so on, the depth continuing to diminish at each throw of the lead until the ship grounded and remained fast. Grant that the master did not intend that the ship should ground on that reef; still it is clear that he was aware that such a danger was the chief one he had to encounter in entering the bay, and the case shows that he deliberately elected and decided to take that hazard, rather than to remain outside, where, in his judgment, the whole interests under his control, and the lives of all on board, were exposed to imminent peril, if not to certain destruction. Under these circumstances, it is not possible to decide that the will of man did not in some degree contribute to the stranding of the ship, which is all that is required to constitute the stranding a voluntary act, within the meaning of the commercial law. 2 Arn. Ins. 785; Emerigon, 324. Suppose the storm outside the bay was irresistible and overpowering, still it does not follow that there was no exercise of judgment, for there may be a choice of perils when there is no possibility of perfect safety. Sims v. Gurney, 4 Bin. 525; 2 Pars. Cont. (5th Ed.) 325, and note y. Destruction of all the interests was apparently certain if the ship remained outside, but the master, under the circumstances, elected to enter the bay, without the assistance of a pilot, knowing that there was great danger that the ship might ground in the attempt; but his decision was that it was better for all concerned to make the attempt than to remain where he was, even if she did ground, and the result shows that he decided wisely for all interests, as damage resulted to none except to the ship, and she would, doubtless, have been destroyed if she had continued to remain outside of the bay. Rea v. Cutler, Case No. 11,599. * * *

["Brief consideration must also be given to the exceptions taken by the claimants, to the report of the commissioner, which were overruled by the court. They are three in number, and they will be considered in the order in which they were made.

["(1) That the commissioner erred in charging the ship or freight with any part of the expenses incurred by the charterers in the ex parte adjustment procured by them prior to the order of reference to the commissioner. Unusual difficulty attends the inquiry, on account of the indefinite character of the exception, and the uncertain state of the evidence; but, the conclusion of the court being that the case is one for general average, it seems to the court that those expenses constitute a matter to be adjusted between the charterers and the libelants, irrespective of the controversy presented in this record, unless the results of that adjustment were adopted and used by the commissioner. Influenced by these suggestions, the exception is sustained, but the matter is left open for further inquiry when the mandate is sent down.

["(2) That the commissioner erred in assuming that the valuation of the ship as given in the policy of insurance is the proper basis of her contributory value in the statement of the amount for general average. As a general rule, the value of the ship for contribution, where she had received no extraordinary injuries during the voyage, and has not been repaired on that account, is her value at the time of her arrival at the termination of the voyage, but if she met with damage before she arrived, by perils of the sea, and had been repaired, then the value to be assumed in the adjustment is her worth before such repairs were made. Neither party gave any evidence as to the value of the ship prior to the disaster except what appears in the policy of insurance, and, under the circumstances, it is difficult to see what better rule can be prescribed than that adopted by the commissioner. Hopk. Av. (3d Ed.) 104; 2 Arn. Ins. 812; Patapsco Ins. Co. v. Southgate, 5 Pet. (30 U. S.) 604; Clark v. United Fire & Marine Ins Co., 7 Mass. 370; Dodge v. Union Marine Ins. Co., 17 Mass. 471. Strictly speaking, the rule is the value of the ship antecedent to the injuries received, but, as that requirement can seldom be met, the usual resort is her value at the port of her departure, making such deduction for deterioration as appears to be just and reasonable. 1 Pars. Shipp. 448; Mutual Safety Ins. Co. v. The George, Case No. 9,982. No proof on that subject, except the policy of insurance, was offered by either party, and, inasmuch as ships are seldom insured beyond their actual value, the exception is overruled.

["(3) That the commissioner erred in carrying into particular average certain expenses incurred by the master at the port where the repairs were made, which should have been regarded as the proper subject of general average. Considerable difficulty also attends this inquiry for the want of a more definite statement of the grounds of the complaint. We think it plain. however, that the exception must be sustained. as some of the matters charged as particular average, in whole or in part, ought clearly to have been included at their full value among the incidental expenses necessarily incurred in making the repairs; but, in view of the circumstances, we shall not attempt to do more than to state the general principles which should regulate the adjustment in the particulars involved in the exception, and leave their application to be made in the case by the court below, where the parties, if need be, may again be heard.

[Whatever the nature of the injury to the ship may be, and whether it arose from the act of the master in voluntarily sacrificing a part of it or in voluntarily stranding the vessel. the wages and provisions of the master, officers, and crew, from the time of putting away for the port of succor, and every expense necessarily incurred during the detention for the benefit of all concerned, are general average. Abb. Shipp. 601; Plummer v. Wildman, 3 Maule & S. 482; Walden v. Le Roy, 2 Caines, 263; Henshaw v. Marine Ins. Co., Id. 274; Nelson v. Belmont, 21 N. Y. 38; The Mary, Case No. 9,188. Repairs necessary to remove the inability of the ship to proceed on her voyage are now regarded everywhere as the proper subject of general average. Expenses for repairs beyond what is reasonably necessary for that purpose are not so regarded, but it is not necessary to examine the exceptions to the rule with any particularity in this case, as the parties agree that all the expenses incurred were necessary to enable the ship to resume her voyage. The wages and provisions of the master, officers. and crew are general average from the time the disaster occurs until the ship resumes her voyage, if proper diligence is employed in making the repairs. Padelford v. Boardman, 4 Mass. 548; Potter v. Ocean Ins. Co., Case No. 11,335. Towing the ship into port, and extra expenses necessarily incurred in pumping to keep her afloat until the leaks can be stopped, are to be included in the adjustment. 2 Phil. Ins. (3d Ed.) § 1326; Orrok v. Commonwealth Ins. Co., 21 Pick. 469. Surveys, port charges, the hire of anchors, cables, boats, and other necessary apparatus, for temporary purposes in making the repairs, are all to be taken into the account, as well as the expenses of unloading, warehousing, and reloading the cargo after the repairs are completed. Potter v. Ocean Ins. Co., supra; The Mary, supra. Repairs in such a case cannot be made by the master unless he has means or credit; and if he has neither, and his situation is such that he cannot communicate with the owners, he may sell a part of the cargo for that purpose, if it is necessary for him to do so in order to raise the means to make the repairs. Sacrifices made to raise such means are the subject of general average. and the rule is the same whether the sacrifice was made by a sale of a part of the cargo or by the payment of marine interest. Orrok v. Commonwealth Ins. Co., supra; 1 Pars. Shipp. 400."]